IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD DEWEESE          :          CIVIL ACTION
                       :
      v.                  :
                       :
NATIONAL RAILROAD PASSENGER   :          NO. 06-4455
CORPORATION and              :
SOUTHEASTERN PENNSYLVANIA     :
TRANSPORTATION AUTHORITY      :

## MEMORANDUM OF DECISION

THOMAS J. RUETER
Chief United States Magistrate Judge                January 29, 2009

       Presently before the court is the Amended Crossclaim of defendant National Rail

Passenger Corporation ("Amtrak") against defendant Southeastern Pennsylvania Transportation

Authority ("SEPTA") (Doc. No. 32).  Amtrak filed a Motion for Summary Judgment, with brief

in support thereof, ("Amtrak Mot.") on its Amended Crossclaim against SEPTA (Doc. No. 34).

SEPTA also filed a Motion for Summary Judgment with brief in support thereof ("SEPTA

Mot.") on Amtrak's Amended Crossclaim (Doc. No. 35), to which Amtrak filed an answer

("Amtrak Ans.") (Doc. No. 37).[1]  By Order dated April 22, 2008, after consent of the parties, the

Honorable J. Curtis Joyner designated the undersigned to exercise jurisdiction over the Amended

Crossclaim to the full extent allowed by statute and rule (Doc. No. 29).

       For the reasons stated below, Amtrak's Motion for Summary Judgment is granted

and SEPTA's Motion for Summary Judgment is denied.

---

[1]       Amtrak and SEPTA each subsequently filed supplemental memoranda of law
(Doc. Nos. 38 and 40).

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff, Richard Deweese, filed suit in state court against Amtrak, SEPTA and the Commonwealth of Pennsylvania to recover damages for injuries sustained on October 28, 2004 when plaintiff was struck by an Amtrak train while he was walking in the track area of the Crum Lynne train station. See Complaint, attached to SEPTA Mot. Amtrak removed the action to federal court and the Commonwealth was dismissed as a defendant. See Doc. Nos. 1 and 8.

On the day of the accident, plaintiff boarded a SEPTA commuter train in Philadelphia, disembarked at the Crum Lynne train station, and walked to a construction job site. After completing work for the day, plaintiff returned to the Crum Lynne train station in order to board a SEPTA train for the return trip to Philadelphia. Plaintiff learned that he had to board the Philadelphia-bound train from the opposite side of the tracks from which he arrived, and then, attempted to cross the tracks. In doing so, plaintiff was struck by an Amtrak train, resulting in serious injuries. Prior to trial, at a settlement conference before the court, plaintiff settled his claims with both SEPTA and Amtrak for $200,000.

The Crum Lynne train station is owned by Amtrak, although Amtrak does not use the Crum Lynne station for its passenger service. The Crum Lynne station is used exclusively by SEPTA for the purpose of providing passenger rail service to its customers; SEPTA leases the Crum Lynne stations from Amtrak. See Lease Agreement between National Railroad Passenger Corporation and Southeastern Pennsylvania Transportation Authority Covering 47 Commuter Stations in Southeastern Pennsylvania ("47 Station Lease Agreement"), attached as Exhibit D to Amtrak Mot. The railroad tracks at the station are owned and used by Amtrak for its service south of Philadelphia. SEPTA also uses the tracks which are situated adjacent to the station with

Amtrak's permission to run its passenger service from Philadelphia to Delaware.  See Agreement between National Railroad Passenger Corporation and Southeastern Pennsylvania Transportation Authority for Northeast Corridor Access and Services ("Northeast Corridor Agreement"), attached as Exhibit E to Amtrak Mot.  Both the 47 Station Lease Agreement and the Northeast Corridor Agreement contain indemnity provisions.  See 47 Station Lease Agreement at 15-16 and Northeast Corridor Agreement at 9-10.  The Northeast Corridor Agreement provides in relevant part:

> Risk of Liability
> SEPTA agrees to indemnify and save harmless Amtrak, its officers, agents, employees, and subsidiaries, irrespective of any fault of Amtrak or such persons, for all damage or for liability for personal injury or property damage which would not have been incurred but for the existence of the commuter service provided by SEPTA. . . .

Northeast Corridor Agreement at 9.  The 47 Station Lease Agreement contains a similar indemnification provision.  See 47 Station Lease Agreement at 15-16.  SEPTA concedes that the Northeast Corridor Agreement is applicable to the case at bar, but does not concede the applicability of the 47 Station Lease Agreement.  See SEPTA Mot. at 4.

Pursuant to an agreement between the parties, Amtrak filed an Amended Crossclaim in which it asserted that SEPTA was obligated to indemnify Amtrak against plaintiff's claims pursuant to the provisions of "the applicable Lease Agreement in effect at the time of the subject incident and the applicable Northeast Corridor Access and Services Agreement in effect at the time of the subject incident."  (Doc. No. 32 at ¶ 22.)  SEPTA filed a response to the Amended Crossclaim in which it asserted that any obligation to indemnify Amtrak that might arise from the agreements is "limited, restricted and conditioned by, and

3

subject to, SEPTA's immunity as a Commonwealth party, as set forth in Article I, Section 11, of

the Pennsylvania Constitution; 1 Pa. C.S.A. Section 2310; and 42 Pa. C.S.A. Sections 8521, et

seq." (Doc. No. 33 at ¶¶ 22-23.)[2]  Amtrak ultimately contends that its enabling legislation

preempts SEPTA's claim that Pennsylvania's sovereign immunity statute prevents SEPTA from

being held liable for contractual indemnity.

## II.   **DISCUSSION**

The parties in this case each seek to direct the court's attention to one of two

distinct topics.  First, SEPTA argues in its Motion that despite the indemnification provision in

the Northeast Corridor Agreement, SEPTA is barred as a matter of law from indemnifying

Amtrak against plaintiff's claims.  (SEPTA Mot. at 5.)  SEPTA asserts that sovereign immunity

is conferred upon it by the Pennsylvania Constitution, the Pennsylvania General Assembly and

the appellate courts.  SEPTA claims, therefore, that it is not bound by the indemnification

provision in the Northeast Corridor Agreement because it lacks the power and authority to

contract away its immunity.  Id. at 5-13.  SEPTA further avers that plaintiff's claims did not fall

within the exceptions to immunity which are enumerated in the sovereign immunity statute.  Id.

In contrast, Amtrak frames the issue for the court in another manner.  Amtrak

contends that a section of its enabling statute, specifically, 49 U.S.C. § 28103(b), preempts

SEPTA's claim that the Pennsylvania sovereign immunity statute prevents SEPTA from being

held liable for contractual indemnity to Amtrak to the extent provided for in the Northeast

Corridor Agreement.  In support of its argument, Amtrak relies upon a recent decision of the

---

[2]      SEPTA raised sovereign immunity as an affirmative defense in its Answer to
Amtrak's Amended Crossclaim.  (Doc. No. 2.)

4

United States Court of Appeals for the Second Circuit, O & G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153 (2d Cir. 2008), petition for cert. filed, __ U.S.L.W. __ (U.S. Jan. 14, 2009) (No. 08-895), pursuant to which the court found a Connecticut statute was preempted to the extent it conflicted with Amtrak's enabling legislation.

The court first will discuss the doctrine of sovereign immunity under Pennsylvania law as it applies to SEPTA.

### A.   Sovereign Immunity

Pursuant to Article I, Section 11 of the Pennsylvania Constitution, the Commonwealth may be sued only "in such manner, in such court, and in such cases as the Legislature may by law direct."   In addition, the Pennsylvania General Assembly has enacted legislation which provides as follows:

> [I]t is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by . . .[statute].

1 Pa. Cons. Stat. Ann. § 2310.  The legislature delineated specific exceptions to sovereign immunity, 42 Pa. Cons. Stat. Ann. § 8522, and provided that such enumerated exceptions would be the only waiver of such immunity.  42 Pa. Cons. Stat. Ann. § 8521(a).  Sovereign immunity is waived in actions for damages "arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity" and must be based

on one or more of nine enumerated acts.  42 Pa. Cons. Stat. Ann. § 8522(a).  That is, the defense

of sovereign immunity shall not be raised to claims for damages caused by: (1) the operation of

any motor vehicle in the possession or control of a Commonwealth party; (2) acts of health care

employees of Commonwealth agency medical facilities or institutions or by a Commonwealth

party who is a doctor, dentist, nurse or related health care personnel; (3) the care, custody or

control of personal property in the possession or control of Commonwealth parties; (4) a

dangerous condition of Commonwealth agency real estate and sidewalks; (5) a dangerous

condition of highways under the jurisdiction of a Commonwealth agency created by potholes or

sinkholes or other similar conditions created by natural elements; (6) the care, custody or control

of animals in the possession or control of a Commonwealth party; (7) the sale of liquor at

Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; or (9) the

administration, manufacture and use of a toxoid or vaccine.  42 Pa. Cons. Stat. Ann. § 8522(b).

Furthermore, the waiver of sovereign immunity is limited to specific types of damages and "shall

not exceed $250,000 in favor of any plaintiff or $1,000,000 in the aggregate."  42 Pa. Cons. Stat.

Ann. § 8528.  For purposes of the Pennsylvania sovereign immunity statute, SEPTA is a

Commonwealth party.  Toombs v. Manning, 835 F.2d 453, 463 (3d Cir. 1987) (citing Feingold v.

SEPTA, 517 A.2d 1270, 1276 (Pa. 1986)).

In its submissions to this court, SEPTA argues that Pennsylvania state courts have

found that the immunity granted to it by the Pennsylvania Constitution and legislature may not be

waived.  (SEPTA Mot. at 8-13.)  SEPTA contends that the issue before the court was previously

adjudicated in favor of SEPTA.  (SEPTA Mot. at 13-19.)  Specifically, SEPTA directs the

court's attention to Apfelbaum v. Nat'l R.R. Passenger Corp., 2002 WL 32342481 (E.D. Pa. Oct.

17, 2002) (Tucker, J.), in which the plaintiff sued SEPTA, Amtrak and other defendants, seeking damages for injuries sustained in a fall at 30th Street Station in Philadelphia. In that case, originally filed in state court but removed to federal court on motion of Amtrak, SEPTA moved for summary judgment, claiming sovereign immunity under 42 Pa. Cons. Stat. Ann. § 8522. Id. at *1. Amtrak opposed SEPTA's motion, arguing that SEPTA waived its immunity when it agreed to indemnify its lessor, Amtrak, from any and all liability arising from or in connection with the use or occupation of the 30th Street Station as part of a lease agreement. Id. Amtrak did not contest whether SEPTA could claim immunity under Pennsylvania's sovereign immunity statute, but rather argued that the real estate exception to sovereign immunity permitted suit against SEPTA. Id. at *2. After reviewing the relevant Pennsylvania case law and legislation, Judge Tucker determined that the Pennsylvania Supreme Court would rule that SEPTA "may not do indirectly what it is expressly forbidden to do directly, and may not waive its immunity by 'any procedural device,' to include contract, and expose itself to liability foreclosed by the legislature." Id. at *4 (quoting City of Philadelphia v. Gray, 633 A.2d 1090, 1093 (Pa. 1993)). The court, thus, found the indemnification provision in the lease agreement to be unenforceable and determined that SEPTA could not be made a party to the plaintiff's claim. Id.

Based upon the foregoing, SEPTA contends that the issue whether SEPTA has the power to waive its immunity in a lease agreement with Amtrak was previously litigated in favor of SEPTA and against Amtrak and collateral estoppel precludes Amtrak from litigating it again. (SEPTA Mot. at 13-19.) According to SEPTA, the "general rule" of collateral estoppel applies in this case and no equitable exception is applicable. SEPTA argues, therefore, that Amtrak's Amended Crossclaim should be dismissed on these grounds. Id. at 19.

In response, Amtrak concedes that SEPTA does not have the power to waive sovereign immunity via contract or otherwise. (Amtrak Ans. at 2.) Amtrak further concedes that, in Apfelbaum, the issue of whether SEPTA can contract away its sovereign immunity and "expose itself to tort damages in situations forbidden by the Pennsylvania General Assembly was fully litigated by the parties and was subject to final judgment by the court." Id. In contrast to the Apfelbaum case, however, Amtrak does not contend presently that SEPTA waived its sovereign immunity. See Amtrak Ans. at 2. Rather, Amtrak strenuously argues that its enabling legislation preempts Pennsylvania's sovereign immunity statute under the circumstances before the court. (Amtrak Mot. at 6-11.) The doctrine of collateral estoppel does not preclude this court's review of Amtrak's preemption argument, because the issue was not adjudicated in Apfelbaum. See Cospito v. Attorney General of U.S., 539 F.3d 166, 171 (3d Cir. 2008) (for collateral estoppel to apply, the identical issue must have been previously adjudicated). For the reasons set forth below, the court finds persuasive Amtrak's argument that to the extent that the Pennsylvania sovereign immunity statute conflicts with Amtrak's enabling legislation, the Pennsylvania sovereign immunity statute is preempted. Therefore, the court need not address whether SEPTA's assertion of sovereign immunity is valid under state law.

## B.     Federal Preemption

The doctrine of federal preemption is rooted in the Supremacy Clause of the United States Constitution which "invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough County v. Automated Med. Labs, Inc., 471 U.S. 707, 712 (1985) (citing U.S. Const., Art. VI, cl. 2 and Gibbons v. Ogden, 9 Wheat. 1, 211 (1824)). The Third Circuit Court of Appeals recently summarized the doctrine of preemption as follows:

8

> [t]he Supreme Court has identified three major situations where there is
> preemption . . . (1) "express" preemption, applicable when Congress expressly
> states its intent to preempt state law; (2) "field" preemption, applicable when
> "Congress' intent to pre-empt all state law in a particular area may be inferred
> [because] the scheme of federal regulation is sufficiently comprehensive" or "the
> federal interest is so dominant that the federal system will be assumed to preclude
> enforcement of state laws on the same subject;" and (3) "conflict" preemption,
> applicable when "state law is nullified to the extent that it actually conflicts with
> federal law," even though Congress has not displaced all state law in a given area.

Fellner v. Tri-Union Seafoods, L.L.C., 539 F.3d 237, 242-43 (3d Cir. 2008) (internal citations

omitted), petition for cert. filed, __ U.S.L.W. __ (U.S. Jan. 13, 2009) (No. 08-889).  An actual

conflict arises when it is impossible to comply with both the federal and state laws or when the

state law stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress.  Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 899 (2000);

Colacicco v. Apotex Inc., 521 F.3d 253, 265 (3d Cir.2008) ("A conflict between state and federal

law arises when compliance with both federal and state regulations is a physical impossibility or

when state law stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress."), petition for cert. filed, 77 U.S.L.W. 3229 (U.S. Oct. 2, 2008) (No.

08-437).

　　　　Amtrak does not argue that its enabling legislation expressly preempts

Pennsylvania's sovereign immunity statute, nor does Amtrak raise a field preemption claim.

Rather, conflict preemption is at issue in the case at bar,[3] as Amtrak argues that the Pennsylvania

---

[3]　　　　The court recognizes the presumption against preemption.  In a recent decision,
Fellner v. Tri-Union Seafoods, L.L.C., petition for cert. filed, __ U.S.L.W. __ (U.S. Jan. 13,
2009) (No. 08-889), the Third Circuit acknowledged that the Supreme Court has traditionally
applied a presumption against preemption of state laws. 539 F.3d 237, 248-49 (3d Cir. 2008)
(citing Medtronic v. Lohr, 518 U.S. 470, 485 (1996) and Hillsborough County v. Automated
Med. Labs., 471 U.S. 707, 715 (1985)).  The Third Circuit also noted that "[r]ecent Supreme
Court jurisprudence suggests that the presumption remains applicable when preemption claims

sovereign immunity statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in granting Amtrak the statutory right to enter into indemnity agreements which allocate financial responsibility for claims filed against it. (Amtrak Mot. at 11.) Amtrak contends that "any claim that, under state law, Amtrak is limited in its ability to freely enter into and enforce its rights under such contracts, is preempted." Id.

Section 28103 of Title 49 of the United States Code was enacted as part of the Amtrak Reform and Accountability Act of 1997 (the "Reform Act"). Section 28103(b) provides that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility." Amtrak contends that § 28103(b) has broad preemptive power to override state law which limits Amtrak's ability to enforce the terms of contractual indemnity provisions entered into between Amtrak and another party.

The first step in determining whether a claim is preempted is to evaluate the relevant statute for evidence of congressional intent. Fasano v. Fed. Reserve Bank of New York, 457 F.3d 274, 284 (3d Cir. 2008) (citing C.E.R. 1988, Inc. v. Aetna Cas. and Sur. Co., 386 F.3d

_____

concern areas of the law which the States have traditionally occupied, but that it may not be applicable where the interests at stake are uniquely federal in nature." Id. (internal citations and quotations omitted). Ultimately, the court determined that:

> Although we are aware that the Supreme Court has applied the presumption in few conflict preemption cases of late, and arguments have been raised that the conflict preemption analysis subsumes or supplants the presumption, see Colacicco, 521 F.3d at 265, we will continue to apply the traditional presumption until the Supreme Court provides guidance to the contrary. Id. See also Hillsborough County, 471 U.S. at 715, 105 S. Ct. 2371 (applying the presumption to implied preemption claims).

Id. at 249. The court further noted, however, that "even where the presumption applies it will be overcome where a Congressional purpose to preempt or the existence of a conflict is 'clear and manifest.'" Id.

10

263, 270 (3d Cir. 2004)), cert. denied, 549 U.S. 1115 (2007).  The purpose of Congress "is the

ultimate touchstone in every preemption case."  Altria Group, Inc. v. Good, 129 S. Ct. 538, 543

(2008) (internal citations omitted).  See also English v. Gen. Elec. Co., 496 U.S. 72, 78-79

(1990) ("Pre-emption fundamentally is a question of congressional intent. . . .").

        To understand the intent of Congress when it passed the Reform Act, Amtrak

directs the court to the recent opinion of the Second Circuit Court of Appeals in O & G Indus.,

Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153 (2d Cir. 2008), petition for cert. filed, __

U.S.L.W. __ (U.S. Jan. 14, 2009) (No. 08-895).  In O & G, the Second Circuit analyzed whether

§ 28103(b) of the Reform Act preempted a Connecticut statute which nullified indemnity

agreements insulating a contracting party from its own negligence.  Under the facts of that case,

the indemnity claim was based upon an indemnification clause in a permit issued by Amtrak to O

& G to perform construction work on Amtrak property.  Id. at 157-58.  During the course of two

consolidated tort actions against it for wrongful death and personal injury damages resulting from

a train accident, Amtrak brought a third-party indemnity complaint against O & G, seeking

indemnification for liability on the claims.  Id.  O & G appealed the district court's ruling which

upheld the validity of the indemnity provision, finding that § 28103(b) preempted a Connecticut

statute which prohibits, on public policy grounds, indemnity agreements entered into in

connection with construction contracts if they purport to shield the indemnitee from liability for

its own negligence.  Id. at 156.  On appeal to the Second Circuit, O & G argued, inter alia,[4] that

---

      [4]      O & G also argued, unsuccessfully, that no irreconcilable conflict exists between
the federal and Connecticut statues because Congress intended § 28103(b) to apply only to
passenger claims.  O & G, 537 F.3d at 161.  The Second Circuit found this argument unavailing.
The statute contains no limitation on its face and does not so define "claims."  Id.

"the scope of § 28103(b) only extends to indemnity agreements between Amtrak and the freight

railroad companies that own most of the rail lines on which Amtrak operates and are reluctant to

shoulder liabilities stemming from the use of their tracks by passenger trains." <u>Id.</u> at 162.  The

court found O & G's claim unpersuasive because of the unambiguous text of § 28103(b).  <u>Id.</u>

Congressional intent did not direct a contrary finding, according to the Second

Circuit.  The court noted that Amtrak is a passenger rail provider mostly operating on track

systems owned by freight railroads.  <u>Id.</u> at 162.  Accordingly, the legislative history of the

Reform Act frequently referred to liability allocation agreements between Amtrak and host

freight railroads; however, there was no evidence of congressional intent that § 28103(b) applies

only in that particular set of circumstances.  <u>Id.</u>  Rather, as characterized by the Second Circuit,

"the goal of the Reform Act was to shield <u>all</u> of Amtrak's indemnity arrangements from legal

attacks on their validity." <u>Id.</u> (emphasis in original).

Indeed, the legislative history of the Reform Act demonstrates that the Reform

Act was passed at a time of financial crisis for Amtrak and was intended to assist Amtrak with

achieving operating self-sufficiency.  S. Rep. No. 105-85, at 1 (1997).  One of the major

provisions of the bill sought to address needed liability reforms.  The Senate Committee Report

makes clear that the Reform Act was intended to ensure the enforceability of indemnification

agreements between Amtrak and other parties.

> [T]his bill clarifies that indemnification agreements related to the provision of rail
> passenger service entered into by Amtrak and other parties would be enforceable.
> The Committee has been requested by Amtrak to include this provision in order to
> aid Amtrak in achieving operating self-sufficiency.  Amtrak and the freight
> railroads believe legislation is necessary to confirm enforceability of the
> indemnification agreements they have entered into regarding operation over each
> others' rail lines, notwithstanding allegations of gross negligence by a freight

12

> railroad or Amtrak.  As long as there is the possibility that state laws governing indemnification contracts may make these contracts unenforceable, Amtrak and a freight railroad may find themselves litigating with each other.  Amtrak believes that such litigation inevitably would not only adversely impact business relationships between Amtrak and the host freight railroads, but it would also lead to significantly higher outlays in settlements and judgments to plaintiffs.

Id. at 5.  See also S. Rep. No. 105-85, at 14-15 (similar analysis of section 28103(b)).

At the time of the passage of the Reform Act, Amtrak's financial condition was dire.  See 143 Cong. Rev. S11929-03 (comments of Sens. McCain, Hutchinson, and Jeffords). See also 143 Cong. Rev. S11929-03 (comment of Sen. Biden) ("Amtrak is indeed in dire economic trouble.").  The statements of the various Senators who were involved in the drafting of the Reform Act reveal that Amtrak was viewed as a critical component of the nation's transportation system that could not be permitted to fail.  See e.g., 143 Cong. Rev. S11929-03 (comment of Sen. Kerry) ("I would like to take a moment just to emphasize what I think can't be emphasized enough, which is the importance of Amtrak to the country and particularly important to the Northeast Corridor Improvement Project and to the transportation infrastructure of the Northeast region of the country.").  It was suggested that the national passenger rail system is an underutilized infrastructure which provides "the opportunity to move cars off the highways and planes from the air." 143 Cong. Rev. S11929-03 (comment of Sen. Jeffords).  According to Senator Kerry, "the continued modernization of rail travel in the Northeast" was vital to address the country's increasing transportation problems.  Senator Kerry also stated that "a healthy and financially viable passenger rail system is the key to ensuring an efficient transportation infrastructure in our country." 143 Cong. Rev. S11929-03 (statement of Sen. Kerry).[5]  After the

---

[5]      Senator Lautenberg also commented that "our national transportation system is crucial to our economy.  And a national rail system is a crucial part of any national transportation

13

passage of the bill, Senator Lott expounded on the issue of contractual indemnification

agreements.  Senator Lott stated:

> Let me just take one moment and clarify one important issue within this reform
> bill.  The current industry practice between Amtrak and other rail carriers is to
> allocate financial responsibility for claims.  This makes sense and in fact many
> such contractual agreements exist today.  The language in section 28103(b) of the
> bill is intended to confirm that such contractual agreements are consistent with
> Federal law and public policy.  One should not construe this section as modifying
> such agreements.  Today, the Senate has taken action to ensure America's
> passenger rail service will not be interrupted. And, the Senate also mandated
> reforms to assure a prosperous passenger railroad.  Mr. President, this
> reauthorization reform for Amtrak is long overdue, but it is on the right track.

143 Cong. Rev. S11929-03 (statement of Sen. Lott).

Based upon the facts before it and its review of the legislative history of the

Reform Act, the Second Circuit in O & G concluded that the Reform Act preempted the

Connecticut statute which nullified indemnity agreements insulating a contracting party from its

own negligence.  The court stated:

> Against this legislative background, contentions that Congress intended to allow
> state law or public policy to interfere with Congress's attempt to rescue Amtrak
> are simply not persuasive.  We believe that we must enforce and recognize the
> validity of the indemnity provision in the Permit.  Applying the Connecticut
> statute would violate the plain language and spirit of § 28103(b), which therefore
> preempts the Connecticut statute.

O & G, 537 F.3d at 163.

Similarly, upon the facts presented to this court, the court is persuaded that the

Reform Act preempts the Pennsylvania sovereign immunity statute.  Supreme Court precedent

dictates that a court find preemption where it is impossible for a private party to comply with

both federal and state law and where under the circumstances the challenged state law stands as

---

plan."  143 Cong. Rev. S11929-03.

14

an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (internal citations and quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Id. The Supreme Court has further clarified: "If the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power." Id. (citing Savage v. Jones, 225 U.S. 501, 533 (1912)).

Applying this standard, the court views the Pennsylvania sovereign immunity statute as an obstacle to the accomplishment of Congress' full objectives under the Reform Act. The legislative history of the Reform Act makes clear that at the time of its passage, Amtrak was not only in a financial crisis, but also that Amtrak was viewed as a critical component of the nation's transportation system that could not be permitted to fail. Furthermore, the legislative history indicates that one of the major provisions of the Reform Act was the intention that Amtrak be free to allocate financial responsibility for claims.

Based upon the foregoing, this court must enforce the validity of the indemnification provision in the Northeast Corridor Agreement. To the extent that the Pennsylvania sovereign immunity statute conflicts with the Reform Act, it is preempted. See Root v. New Liberty Hosp. Dist., 209 F.3d 1068, 1070 (8th Cir. 2000) (finding Missouri's sovereign immunity statute preempted by federal Emergency Medical Treatment and Active Labor Act). SEPTA's contractual obligation to indemnify Amtrak in accordance with the terms of the Northeast Corridor Agreement is not subject to, nor limited by, the Pennsylvania sovereign

15

immunity statute, 42 Pa. Cons. Stat. Ann. §§ 8521 et seq.

For the foregoing reasons, Amtrak's Motion for Summary Judgment is granted and SEPTA's Motion for Summary Judgment is denied.  An appropriate order follows.


BY THE COURT:


THOMAS J. RUETER
Chief United States Magistrate Judge

16

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD DEWEESE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NATIONAL RAILROAD PASSENGER | : | NO. 06-4455 |
| CORPORATION and | : | |
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSPORTATION AUTHORITY | : | |

## <u>O R D E R</u>

AND NOW, this 29th day of January, 2009, upon consideration of the Motion for Summary Judgment with brief in support thereof filed by defendant National Rail Passenger Corporation ("Amtrak") (Doc. No. 34), the Motion for Summary Judgment with brief in support thereof filed by defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") (Doc. No. 35), Amtrak's Answer to SEPTA's Motion for Summary Judgment (Doc. No. 37), and Amtrak and SEPTA's supplemental memoranda of law (Doc. Nos. 38 and 40), it is hereby

## ORDERED

that Amtrak's Motion for Summary Judgment is granted and SEPTA's Motion for Summary Judgment is denied, as set forth in the attached Memorandum of Decision.  Judgment is hereby entered in favor of Amtrak and against SEPTA on Amtrak's Amended Crossclaim (Doc. No. 32).


BY THE COURT:


THOMAS J. RUETER
Chief United States Magistrate Judge